22-1280 and 22-1376Epsilon Energy vs. Chesapeake Appalachia and Mr. Fitzgerald. Thank you, Your Honor. May it please the Court, Matt Fitzgerald for Epsilon and I'd like to reserve three minutes, please. Granted. This is a cross appeal with four issues, but I'd like to begin with the indispensable party issue on which the District Court should be affirmed. The absent contracting parties in this case are not indispensable under Rule 19. Epsilon sued the sole party causing us any trouble under this contract and the sole party positioned to cause us any trouble under this contract. The District Court correctly recognized that there was no reason to turn this two-party dispute into a nine-party circus and should be affirmed. Now, this Court in the Janney decision made clear that review of this issue is only, quote, deferential abuse of discretion. Rule 19 addresses itself to the equity and good conscience of the District Court who exercised its discretion in a 22-page opinion that correctly identified by all accounts all of the factors and found that each of those factors favors keeping the case in federal court. Now, Janney also makes... The standard review here is fascinating because it certainly is abuse of discretion, but underneath it is questions of law, right, regarding the application of 18a and 18b. And so you have the District Court saying, well, they're necessary parties, but they're not indispensable. And as I understand the District Court's analysis, it largely turns on the idea that the arguments that are going to be advanced by the absent parties are well represented by the parties to the suit. I don't see that in 18b, though, as a factor. So is that a legal question or is that a discretionary question? I don't think that's a legal question. I think that's a discretionary, essentially a factual issue that's within the discretion of the District Court. So it's still true that nobody in this case has ever put forth an argument that any of these absent contracting parties could make that would not be argued by Epsilon or Chesapeake. And, in fact, some of the issues in this case really could only arise between two parties. So, for instance, one of the issues is whether Epsilon alone can change the operator when Chesapeake refuses to drill, but inherent in that dispute is there being only one JOA party that wants to change the operator for that particular well. And so it's a factual judgment call made by the District Court. But there are other facts. I don't think that's necessarily the key dispositive one. There are other reasons that the District Court found in its opinion. One of them that I think is notable is that in the 12 years that these JOAs have existed, none of these absent parties have ever proposed a single well. So they're really not positioned, as the District Court found, it's speculative to imagine that the issues between Epsilon and Chesapeake are ever going to arise for these other parties at all. Well, what if we just focus on the consequences of this particular suit for those absent parties? Because the particular wells that we're dealing with here, the parties have their own views, and the wells that they seek to drill seem to be, as they see it, mutually exclusive. But we have other parties, like Radler 2000, that seem to take the position you can do both. How is that represented? Well, Your Honor, so it's important to keep in mind, I think, that for every well that's proposed, all of the parties have really three options. They can opt in. They can pay their money and take their profits. They can opt out, which essentially is saying, you go ahead, we don't want to pay for this, and we won't get anything out of it unless you're extremely profitable. Or they can propose a competing well. And that's what they should do. If they really didn't want Epsilon's well drilled, they would propose a competing well. And this is in the contract. It's in the appendix at page 122, how that all works. And the point is, if a competing well gets a majority subscription, then it defeats the initial one that's proposed. And so what we have here, though, is for all of these most recent round of Epsilon's proposals, all of the other parties have opted out. They didn't join and say, we want a cut of this. They didn't propose a competing well, essentially saying, we don't think you should drill this at all. Well, that seems to suggest they're okay with you going forward, I guess, right? Well, really, it seems to suggest they simply don't want any part of it, which further shows that they're not indispensable under Rule 19. Well, I'm not sure their indifference means that they're indispensable under Rule 19. Isn't the measuring stick whether this case would affect their rights, either positively or negatively? Well, I think given what they've done on Epsilon's proposals, it just doesn't seem likely that they certainly haven't, or that they will in the future, do the things necessary to really be a part of these wells that are proposed, where they have options that are undisputed. Well, right, but that just points up their indifference. I mean, I take your point. I mean, if they wanted to intervene, they could have. Exactly. It's not like they're – it's hard to imagine that they're unaware of this litigation. Oh, they're – right. They're aware of the litigation. In fact, we have an affidavit filed by Equinor, one of the other parties, less than two weeks after this litigation started at the preliminary injunction stage. It's a three-page affidavit. It doesn't seem to take any real position on any of the big issues, and it doesn't show any interest in further participation. Right, but that doesn't mean – it doesn't answer the question whether Equinor and the other parties to the JOA would have their rights affected by this decision. And what I'm wrestling with is when we adjudicate the many issues between the parties in this case, including things like does it apply only to original wells or to wells that are being maintained? What does the 90-day requirement mean? All of those decisions are going to impact not only Epsilon and Chesapeake, but also the other parties to the JOA, aren't they? Well, I think not necessarily, Your Honor. And so there's one more thing beyond the finding of the district court, which is subject to deference here that it's speculative that this will ever matter to them, and that is the presence of the settlement agreement solely between Epsilon and Chesapeake. So the key to this suit is a declaratory judgment suit. It's brought under the JOAs but also under a settlement agreement, which is only Epsilon and Chesapeake. And so the district court, as it recognized in the exercise of its discretion, could craft relief under the settlement agreement that would satisfy Epsilon, and it could essentially avoid the risk that you're talking about entirely that way. And the way that would look. Okay, yeah, how would that look? Because I get district judges have a lot of latitude, a lot of discretion, but I'm trying to think of how, as a district judge, I would write an order interpreting a contract and indicating that the contract means one thing for Epsilon and Chesapeake, but it doesn't mean the same thing for all the other parties to the JOA who are not parties in the case. Right, Your Honor. So the settlement agreement, what the district court could say is this. The district court could say, we have here a broad contract dispute with a bunch of issues between Epsilon and Chesapeake, and they're the ones who are positioned to have brought it, but we also have a settlement agreement that is solely between these two parties, and this is on page 447 of the joint appendix, the key part of the settlement agreement. And the settlement agreement specifically says that under the exact circumstances of this case, Chesapeake is going to cooperate with Epsilon. So it says when a party proposes a will that Chesapeake does not agree to participate in and Chesapeake does not agree to drill, Chesapeake will cooperate with Epsilon. And so the court could say, well, we have here a complex, perhaps, contract dispute, but there's a straightforward answer, which is under the settlement agreement, Chesapeake is obligated to cooperate with Epsilon, and it could craft its relief that way in a way that would satisfy Epsilon. Was there anything to stop the court from actually doing that in this case? No. That's not what happened, right? Well, the court, The court proceeded to adjudicate the contract, right? Well, the court recognized at the indispensable party, in the order on indispensable party, that it could craft the relief. And we think after the dismissal is reversed that it still could do that. But I think also the district court, as it ruled, it was speculative that any of these other parties would care. And so it did go on, of course, and address the contract. Well, that brings me back to what I was asking before. Is that the touchstone? Whether they're indifferent, whether they care? I haven't seen anything in Rule 19 or in the case law interpreting Rule 19 to say the touchstone is whether parties that are put on notice of the existence of the suit really care to show up. Well, Your Honor, it was a consideration that this court cared about in Janney that the absent party could have sought to intervene and never had. The court mentioned that in its analysis. And we have here a group of things. So one of them is none of these other parties have ever proposed a will, ever, since these agreements have existed, much less a will that Chesapeake doesn't want to drill. They haven't proposed it. Perhaps they never realized that they could just designate themselves operator and move forward. Well, the agreement says that, Your Honor, of course, on page 121 of the joint appendix, that the consenting parties, essentially the universe of consenting parties, can designate an operator if Chesapeake doesn't want to do it. And so I think that's just clear on the face of the agreement that that's a right that they all have. But that is a declaration that interprets the contract, and you seem to be acknowledging would interpret that as to the absent parties. Well, there is a path, though, that the district court could resolve the case under the settlement agreement, saying Chesapeake must cooperate with Epsilon. And as a realistic matter, I think that would solve the problem because the district court's right. No one else has proposed anything. No one else has shown an interest in participating. And these are the same sorts of things that matter in Janney on deferential review here to the district court. I want to understand the consequences of this case for the absent parties, and in particular the rights that seem to be built in for non-consenting and consenting parties under Article VI. Because you're arguing that they won't be prejudiced because they've got that non-consent penalty in Article VI. They don't have to bear the cost, but they also don't get to recoup their royalties. But then on the back end, there's consequences too, right, in terms of whether they get to recoup anything after the 400% threshold has been met. So the way that it's set up is if a well is drilled and they are non-consenting parties, they don't contribute anything up front. They don't take on risk and liability. Once the well profits beyond, I think, 400% if it's a new well, then they do ultimately get their share. But, you know, in this particular area with the wells that have been drilled and what's realistic, it would have to be an exceptionally profitable well to reach that threshold. I mean, this area at this point is worked over a bit. And how about for consenting parties? Because we have, for one of the wells, we do have some consenting parties, right? Well, no, so the most recent round of four proposals for May 2021, no one else consented to any of those. So there was a discussion, a couple of the parties, some of the tiny fractional interest holders consented in the first round, but those expired, we reproposed, and no one consented to the most recent round. So there isn't anyone who's in on any of the currently proposed wells. And as what the district court said when it was thinking about the indispensable party issue is essentially they've opted out. You know, they've chosen the path that is you go forward, we don't want to chip in, we don't want realistically profits from this, we don't want to pay our share or any share. And so having done that, and that's not a disputed obligation. I mean, they have the right to opt out like that. So given the record proves, I suspect that happened, but what in the record proves that they opted out? It's in the joint appendix, Your Honor. The letters that are coming to and from the parties I think are. Just like the thing that you referred that Equinor sent that counts as opting out? Well, that was an affidavit at the preliminary injunction, but there are actually letters. So what they're sent, and this is in the appendix I think it's at, I know that the outgoing letters are at 590 to 630 or so, but we said here's what we're proposing, here's the proposal, here's your share. And now for most of these parties, keep in mind, the share is tiny. Like apart from Equinor, for the wells that we propose, no one owns more than maybe 2% of these. So, you know, to opt in is a handful of dollars, to opt out is a handful of dollars potentially lost. You know, they're just not at the core of this dispute in the way that the parties this Court has recognized are indispensable are. I mean, this is really a dispute between Epsilon and Chesapeake. We are the one whose primary assets are in this area, the one who needs to push and move forward, and the others are doing their best to sit on the sidelines. Well, we should give you a few minutes to talk about the merits, because we've been coming in with questions about Rule 19. So there's several merits issues, but the central one is the meaning of that first sentence of Article 6.2. The parties modified that from the 1989 model form, and we think that the best reading of that sentence, as a matter of plain text, is that it exempts the drilling of new wells from the 90-day time limit. And this is really just the structure of this sentence. That sentence sets a 90-day limit. Under the model form, it covered all types of work, and it's in the appendix at 121. There's a little caret. The parties have gotten rid of all work and replaced it with subset, re-complete, plug back, rework. And the exemption of drilling means that drilling is exempt from that 90-day deadline. And that just makes sense, because when these contracts were signed, the area that this was done in, some of it was underdeveloped. There was not infrastructure, not necessarily wells and well paths and roads. So it makes sense that to drill a new well is going to take more time than to do any of this work on an existing well. What about Chesapeake's argument that on the 90-day commencement deadline, you didn't really argue in the district court that it was limited to rework modification operations. Instead, you argued that the deadline conflicted with Article 16. Isn't that what happened in the district court? No, Your Honor. And you can see there's two places to look. The district court actually recounted the argument that we made, the same as the argument we're making here. Well, just point us to where in the record you argued in the district court that the 90-day commencement deadline is limited to the rework modification. I believe it's docket 111, pages, say, 11 to 15. But I also encourage you to look at the joint appendix, pages 14 and 15, which is in the district court's order where she said what we argued, and she described it the same kind of way as what we argue here. So, I mean, the district court repeated it back, basically, to the parties before she addressed it, that we were making a textual argument that the 90 days did not apply. It was also argued at the preliminary injunction hearing, which is docket 86 and 87. It's a transcript. Isn't Article 6 the same provision that allows for operator shifting at all? It is one of them, yes, and it's the relevant one here. So there's a sentence that I've just been talking about, and then further down in that same paragraph it talks about when, if Chesapeake declines to be the operator, if it opts out and it declines to operate, then the consenting parties designate a new operator from among one of them. So if this paragraph doesn't apply to new wills, what does that do to the rest of the argument? Well, so I think it's clear. So when you look at it, it isn't just this paragraph, and I'll say that between that sentence and the next sentence, there is a reference to the operator performing all work. And so the provision that can involve a replacement operator is a reference to all work and not the subset from the deadline. And I think you can see that, too, because the rest of Section 6.2, which goes on for two or three more pages, talks about the drilling of a new will like eight times in two pages. In fact, it specifies when you're drilling a non-unanimous will, here's what happens to the non-consenting party's interest. We just talked about it, how their interest is removed until you get to the 400%. So clearly this broader provision, which is 6.2, is all about non-unanimous projects, and it addresses the drilling of a new will just over and over again. So the right way to read that first sentence is it is exempting from the timing provision. And this also, we pleaded course of performance as well, in particular that Chesapeake has proposed wills with more than 90 days to initiate and also that it has drilled non-unanimous wills. That's at page 94 to 96 of the appendix, our allegations about that. And Chesapeake hasn't disputed them. Of course, we're at the motion to dismiss. If there were a factual dispute, that's just another reason to survive the motion to dismiss, but that's the way that the parties have understood this before this dispute. Why would we read the contract that way when the language and the insertion of this in rework, you know, sidetrack, et cetera, that seems to be expanding on the title, right, determination of participation in rework, et cetera. Oh, I think there's a carrot there, Your Honor. What it's actually, so if you imagine the little carrot and the bold language not being there, then it would be saying all of this non-unanimous work must be commenced within 90 days. And that would be all the categories. So you can see in the other places in 6.1 and 6.2, it normally lists all of these things, and it starts with drill, rework, re-complete, plug back. And in this instance, they took drill out, and they said, so when there's notice provided to carrot, rework, re-complete, plug back. So the drilling of a new well is missing from that section, and the effect of that is to remove it from that particular sentence, which is setting the 90-day deadline. So you see it's inserted in the sentence, not in the title of that paragraph. Correct, yeah, it's where the carrot is. There's a little pointy thing. I think it's right after to such notice as delivered or to such notice to rework, re-complete, or plug back. We'll hear you on rebuttal. Thank you, Mr. Fitzgerald. Thank you. Mr. Dempsey. May it please the Court, Jack Dempsey on behalf of Chesapeake Appalachia. Given that we're cross appellants, I know it's not typical that rebuttal be reserved. I would ask the Court for two minutes to comment on my adversary's argument, if the Court would permit me. Sure. Thank you. By failing to name the absent JOA parties, Epsilon manufactured subject matter jurisdiction. Epsilon sought a declaration that joint operating agreements between a half-dozen working interest owners permit Epsilon to unilaterally remove the operator and designate itself to drill and complete three gas wells at a cost of north of $22 million. Epsilon sued no working interest owner other than Chesapeake. In response to questions from this panel, what I understand my adversary now to argue is that the District Court could craft its relief under the settlement agreement. That's not a fair argument. That is not what Epsilon asked the District Court to do. If you look at the complaint that was filed in this case, it is perfectly clear that what Epsilon asked the District Court to do was to enter a declaration that under the JOA contracts, Epsilon was permitted unilaterally to appoint itself to drill three wells that had the support of no other parties to the agreement, to drill and complete those wells after removing Chesapeake as operator, and then to recover 400 percent of its costs in doing so against the property interest of the parties it chose not to name. It seems like it also had no opposition to this proposal. Let's assume, though, that maybe you've got a good argument, and looking at this anew, we would see it differently. Why is what the District Court did here in the careful balancing of the equities and abuse of discretion? The court abused its discretion because it made both clearly erroneous findings of fact and also committed legal error in reaching its judgment. This court identified the Texas Court of Appeals opinion in Bradco Oil as a case that is analogous, and that is true on nearly identical facts to the facts presented in this case. The Texas Court of Appeals held all working interest owners are indispensable because the action, quote, seeks to determine or alter legal rights and obligations resulting from operating agreements to which they are parties. That is exactly what's going on here, except this case is stronger than Bradco. What's the error? You mentioned errors of fact. What are those? Well, I think the court makes errors of fact in deciding that all positions asserted in the case, or that could be asserted, are asserted either by Chesapeake or Epsilon. That's not true, and we identified that in our briefing. And the court... What are the positions that the other, that Equinor or other parties would make? One position is Equinor or the other parties could argue that unanimous consent is required to drill a subsequent well under the joint operating agreements. And the reason I point the court to that position is because when you look at the third-step brief filed by Epsilon in this case, Epsilon suggests that unanimous consent is a position being taken and advanced by Chesapeake on behalf of the absent parties. It's not a position taken by Chesapeake at all in this case. Chesapeake doesn't take the position that under Article 6-2A of the joint operating agreement, unanimous consent is required to drill a subsequent well. Chesapeake takes the... You say more than one. Well, we... It has to be more than... If you don't, if Chesapeake says no, then Epsilon can do it as long as they get somebody else, because you say it says parties, not party. That's your argument. And it follows the first, which is that paragraph in Article 6-2A that contains the operator shifting language is inapplicable to a subsequent well. And that's because that paragraph has the interlineated language that limits its application to work on existing wells, rework, sidetrack, plug back. The operator shifting language is in that paragraph, and that paragraph is not applicable to a subsequent well proposal. Even if it were, we argued to the district court, even if that provision were to apply, no party can unilaterally designate itself as operator and remove Chesapeake, because the textual language of the paragraph, even were it to apply, simply does not support it. It requires more than one consenting party to remove an operator, and for good reason. Aren't all of the risks and attempted arguments against those risks being presented to the district court? So it sounds like you've identified an issue that you're saying could alter the interests of the absent parties, but that's being ably argued, and the district court is fully aware of it, so what's the prejudice then? Well, the, I, there is prejudice to parties that are parties to the agreement, the litigation is interpreting the rights of the parties to the agreement, and they're not part of that case. That's prejudice. That's definitionally prejudice. Their behavior seems to suggest just the opposite. They don't care. They're not interested. Judge, I disagree. Then where are they? These are not unsophisticated entities. Equinor filed an affidavit making its position very clear to the court. It took the position it opposes the wells that are suggested by Epsilon, so it opposes, elects not to participate, and it recognizes Chesapeake as operator, which we are, not Epsilon. So its position is perfect. Yeah, but those arguments are being made by you, by Chesapeake. Why, which is why Equinor is not indispensable. Chesapeake is carrying the ball here. Equinor is indispensable. What would Equinor say, what does the affidavit tell us, or the record tell us about what Equinor would say that's different than what Chesapeake would say? We don't know. They're not parties to the case. They may take the position that Article 6.2a, which deals with proposals. They've explicitly said they don't want to take a position. They don't want to be in the case. They have not said that explicitly. They have said explicitly what their position is. Right, but they know about the case and they haven't sought to intervene. They could have easily intervened if they wanted to. There's a question about whether they could intervene. Why? Because if they intervene and they are indispensable, which they are, the court would have no jurisdiction. So really this is just a jurisdictional play. Well, it's not a jurisdictional play. The jurisdictional play has been made by Epsilon. The Epsilon chooses purposefully not to name in this case the non-diverse working interest owner, Equinor, which has a $22 million obligation under Epsilon's proposals. And the reason, Judge, I alluded to the fact that I believe this case is more powerful. I mean, it screams out that Equinor would rather have this decided in federal court. It screams out that it would rather have, I think it was Judge Wilson, decide this case than have the case be sent to state court as lacking in diversity. Respectfully, Judge, that's not the test. That's not the test under Rule 19. Does the indispensable party wish to have the federal court shoulder the burden of deciding the case? That is not the test and it's nowhere, as you alluded to, when you're... It wants to take a position. It wants to argue something and say, this is our view, but don't put us in the case because we don't want to deprive the federal court of jurisdiction. It would not be fair for me to speculate what Equinor's position would be. The record is clear. Equinor opposes the proposed Wells and opposes a shift of operator from Chesapeake to Epsilon. And for good reason, I would submit, based upon the record before this Court, Epsilon is not an experienced operator. Are there any cases you're aware of where a party that might have an interest in a case filed an affidavit taking normative positions on the case and was later deemed to be not indispensable?  Yeah, sorry, that was too many negatives, double, triple negatives, I don't know. What I hear you to be saying is that the fact that Equinor submitted this affidavit has taken a position in the case, has opposed what Epsilon is trying to do. All of that screams out, indispensable party, bring them in the case. They need to be heard. Not just the fact that they submitted an affidavit. I think the affidavit underscores the fact that there is a contractual interest in economic exposure to the litigation. It underscores that fact. But even the parties that did not submit affidavits, the minority stakeholders that my adversary suggests are inconsequential. That is not the analysis. The analysis is those parties are parties to a joint operating agreement. They have an expectation under the joint operating agreement that Chesapeake will serve as operator to explore for, drill, complete wells. We are an experienced operator. And that's their expectation, whether or not they submit an affidavit to the court. That brings us back to where you started, which is Mr. Fitzgerald's argument about the settlement agreement. He didn't really push back too hard on the interest of the parties to the JOA being affected by an opinion of this court or the opinion of the district court. Instead, the answer was, and he can correct me if I misunderstood, the answer was the settlement agreement and the district court can craft the remedy. That's an after-the-fact argument. That is neither what they pled in their complaint, which is to seek declaratory relief under the joint operating agreements in an action where they chose not to sue the parties to those agreements, nor is it fair in light of what the district court did, which is to interpret the joint operating agreement. The court made decisions in this case as to whether multiple consenting parties were required, what is the timing when one proposes a subsequent well. Those decisions impact the contractual rights not just of Epsilon and Chesapeake, but the parties who Epsilon chose not to sue. And the settlement agreement, when you look at the paragraph that he alludes to, is very purposeful in its language. It resolved an injunction case that Epsilon commenced in 2018. It did it at a time that a responsive pleading had not yet been filed. And it said, Epsilon or Chesapeake will cooperate to the extent permitted under the JOA. There is a disagreement between these parties about whether Article 628, Paragraph 1, applies to subsequent wells. And that settlement agreement does not decide it, because it couldn't. We couldn't interpret the contract without the other parties in the case. So the settlement agreement is neither consistent with the strategy pursued by Epsilon in this case, an idea that relief could be crafted under the settlement agreement but not the JOAs, nor is it consistent with the way that the district court did in fact handle the case. What are the concrete rights that would be affected by the district court's interpretation for the absent parties here? That is, in terms of their interest, since they opted not to consent, after the 400 percent threshold is met, to the extent that what's in the government governing area might be a finite amount that's being drilled and that could affect their interest, can you explain to us what in concrete terms the district court's interpretation would mean for those absent entities? Absolutely. All those are concrete interests. But let's take it from the perspective of Equinor, which is not named in the case. Equinor, under the operating agreements, has a right to expect that Chesapeake will serve as the operator, conduct all activities within the 1,000 plus acres that are the contract area. That's a concrete interest. Upset by the declaration being sought by Epsilon, which is to remove Chesapeake as operator. Equinor has got a concrete, in addition to the contractual interest, and there are many, Judge, under the joint operating agreement. The joint operating agreement continues for 30 plus pages about rights and obligations and interests between the parties to the agreement, and Equinor has many contractual rights. Early on I suggested to Judge Hardiman that this case is more powerfully in favor of indispensability than Bradco, and so why? Not just does Equinor have contract interest at play, which was Bradco. Bradco said, that's enough. If you've got contract interest, you're indispensable. This case is more powerful because Equinor has property interest. Equinor has an interest in the minerals that are being developed in the contract areas. A property interest, in addition to the contract interest. This Court's decision in Steel Valley analyzes Rule 19 when a party that has not been named has a property interest. And it says, if you've got a property interest in an action that's being adjudicated, where the adjudication of the case will impact the property interest, you are indispensable. And to Judge Maddy's question, that's an error of law. That's where the District Court erred in its 19B1 analysis as a matter of law. Equinor, with a property interest in this case, and the others who are not named, are indispensable. Did the others also have a property interest? They do. They all have a fractional working interest ownership in the minerals. And lastly, an economic interest. And this is glazed over in the briefing by Epsilon remarkably. I think because there's not a perfect answer for it from that side. They say, the absent parties don't have risk. We're going to pay for the drilling. We're going to pay, in Equinor's position, we'll pay their $22.5 million to drill the three wells. But the story that they don't tell is what happens next. The well goes online. It produces gas. Epsilon takes 400% of the $22 million and recovers that against the property interest of Equinor. Until they've been made whole on the $22 million that they put forward for Equinor, plus 400%. And only then does Equinor get back their mineral interest. And so contract interest, which Bradco says, is enough. Property interest and economic interest, which this Court's decision in Steel Valley powerfully supports, is enough. And I would submit this case is an outlier. This is not a case where we need to wonder whether the impact on the absent parties is sufficiently clear or immediate or definite. The impact on the absent parties, it declares their rights under contracts to which they are parties. The declaration Epsilon seeks would permit them to dissipate their property interests, produce that gas, market it, take its value until it has recovered 400% of its cost against the absent party. That makes this case an outlier. That makes this case Bradco plus. When you look at Bradco plus the Steel Valley decision, you will see that the interests in this case are immediate, direct, and definite. The additional factors under 19 are whether a remedy can be crafted or an order could be crafted that would somehow protect. And I would submit to the Court that that simply can't be done. The remedy or the... Well, even if it could have been done, the Court did the opposite. Correct. I take your point on that. Correct. Suppose we agree and we think that the District Court's analysis didn't follow the guidelines of 19B. What's the remedy here? Do we outline what those factors are and then remand it so the District Court can consider it in its discretion again? I think this Court decides. This Court decides that as a matter of law, as it did in the decision in Steel Valley, as it did in the case of Angst v. Royal Maccabees, that as a matter of law, the absent JOA parties are indispensable. And because there is no dispute in the record that Equinor is non-diverse from the plaintiff, the Court lacks diversity and the action gets dismissed. And there's a forum. The fourth factor under the 19B analysis is, is there an adequate alternative forum? Not only is there an alternative forum, but the Court of Common Pleas in Susquehanna County is, is the Court best suited to decide these issues which relate to property law questions of regulated industry, instances where the Commonwealth of Pennsylvania is issuing permits for these operations? When the Court sees the record below, you will see that there are issues about the danger of the proposed operations. Epsilon is not an experienced operator. They have proposed to go on our well pad and to, while our well pad has two active wells producing, they'd like to drill three more. That is not an operation that is done in the ordinary course by Chesapeake, which is an active producer of gas in the Commonwealth of Pennsylvania. What they propose is dangerous and it's unprecedented. And candidly, it's a state, it's a perfect issue to be, to be analyzed by the Court of Common Pleas of Susquehanna County where the pad is located. Thank you, Mr. Dempsey. Thank you, Your Honor. So just to, just to pick right up where that left off. The safety issue here is a red herring. If Chesapeake were concerned about the safety of Epsilon drilling on its well pad, it would agree to drill the well itself on its pad. But what if it thought drilling on the pad alongside the other drilling operations was unsafe? Well, it has multiple operations on the pad already. But what if they think one more is dangerous? So I don't see any logical support for what you say there. What you're saying is they would do it themselves if they thought you doing it was dangerous. And the answer is no. If they thought the best operator in the world drilling another well would be unsafe, then it's unsafe. If they thought that, Your Honor, which I understand, our point here has responded to them. They've asserted that we in particular are unsafe. They've never said, I think, that they think categorically it's unsafe. And if they did say that, their alternative under the agreement would be to propose a competing well and get a majority subscription for that. A well that, you know, couldn't be drilled at the same time and situation as the one that we proposed and move forward that way. Well, it sounds like, I mean, it's a struggle for, you don't like the way they're acting as operator and you want to assert yourself. And you're a significant player, Epsilon is, because you own a lot of percentage here. And isn't that what's going on? Absolutely, Your Honor. All right. And that sort of good faith dispute between business partners to the agreement affects everyone else to the agreement. Well, it doesn't, Your Honor, not as much even as it would in a normal case. And so the reason is... Is he correct that, Ms. Dempsey, correct, that Equinor is opposed to your course, your proposed course of action? Your Honor, the affidavit, I don't think so. The affidavit is in the record. It's at Appendix 855 to about 858. It says a handful of things, but it doesn't ultimately say. It says, I think I quote this exactly, Chesapeake is the operator, which we agree with. Chesapeake is the operator. We don't want to remove Chesapeake categorically whatsoever. There's a whole other provision we're not using for that. We just want the wells that we want drilled, drilled. We'd be happy to have Chesapeake drill them. We're only offering to do it because the agreement has to provide a way if Chesapeake refuses in order to do that. And so just to take a step back and talk about the way that these other parties are protected and what their options are. So every time that a well is proposed, they have these three options. And essentially the options being participate, don't participate, let the other party go forward, and without you at all, or propose a competing well. And if they can get a majority, they can trump our ability and stop us from drilling. And all of these other parties have repeatedly said, no, you go ahead. They haven't proposed a competing well, which is what any of them could do if they were worried about it happening. They've just said, we don't want a part of it. And that really provides great protection for them. But isn't it, to the question Judge Krause asked when you were first up here, isn't it true that perhaps they don't think it's necessary to participate because they read the agreement to say parties, meaning that for your client to become the operator and drill a well would require participation by a second member of the JOA. And they all know that there's nobody else that wants to sign on with you. Well, Your Honor, if they read it that way, that argument is fully embraced by Chesapeake as the operator. And there isn't any reason if they want to be witnesses or they want to participate somehow, we've seen no effort by them to intervene or participate more than the minimal thing that Equinor has done. Which doesn't say... Could that be because on the merits it ended up the way they wanted it to end up? Well, it took a while of litigating in the district court when they could have sought to participate before that happened. You know, there was motion to dismiss briefing, there was a significant preliminary injunction hearing. A lot of things happened during which they could have participated, but they didn't. And I think also it's important to keep in mind that apart from Equinor, these are tiny fractional interests. It's in our proposals. They own like .00 whatever, and so that they... How do you imagine it would be cost efficient for any of those parties to participate in litigation in light of the cost of litigation? We're really dealing with three parties here. Yes, Your Honor, and we know that Equinor has been aware of this from the beginning. Because their affidavit came right in two weeks after the suit got filed. Again, it's three pages long, and when I read it, I don't see a staunch position on anything. And keep in mind, the district court reviewed that and seemed to care about it in finding them not indispensable. Because she said, look, the strongest thing that seems to be in this affidavit is a recognition that if we drill a well without them, they don't get profits until 400%. But that was the choice that they made. That doesn't have anything to do with what is disputed here between Epsilon and Chesapeake. They chose to opt out. It sounds a little... It seems rather incongruous that you would listen to an argument made by a putative party, you'd consider that argument, you'd write an opinion discussing that argument, but yet they're not even a party to the case. I don't know. The question is whether... They're not coming from left field. They're a member of the same agreement that your client and Chesapeake are. They are, but another thing, something we haven't really discussed here is these other parties are positioned like us. I mean, Chesapeake is the only operator, and again, no one is trying to categorically remove them. The other parties are, whatever they think on positions on the various issues, they are positioned like Epsilon is. They're owners of interests who are not the operator. There's such a difference between this case and when parties are found indispensable. But that sounds like you're arguing that Equinor is fully aligned with Epsilon. I just mean as the parties are positioned... Is that true or no? Is Equinor aligned with you or with them? I mean, Equinor's affidavit is filed by Chesapeake when they were opposing the preliminary injunction, but the point is the positioning of this is well covered by Epsilon and Chesapeake, because we have here the operator and we have here the interest owner who is proposing wells and trying to get this moved forward. And I want to distinguish quickly this case from Bradco, which has come up. In Bradco, very important, the issue there was the removal of the operator categorically for all the wells for all the owners. And so the court reasonably thought, well, we should have the other 40 percent of the owners here if their choice of operator is going to be taken away from them by a bare majority. Epsilon is not in any way proposing to remove Chesapeake as the operator. In fact, they're even going to operate the wells that we drill after we drill them. The agreement at page 125 of the appendix says that if a different operator drills the well, it's handed back over to Chesapeake after it's drilled. So we are only trying to drill the exact ones that we want drilled. And, again, these are wells that everyone else has opted out of, done their best not to participate in. And we're not... So what was going to happen in Bradco is the absent parties were going to lose their operator for all of the wells that they participated in and had interest in. And the court thought they should be involved if that was going to happen. Here, none of these absent parties who have maybe... They've participated in other wells that Chesapeake has drilled and operates. They're not going to lose Chesapeake in anything that they have taken an interest in. Well, if the district court's interpretation is upheld, then aren't they, in fact, losing their right to designate an operator because the interpretation of the contract is someone can just designate themselves if that's not what they signed up for in the operating agreement? Well, I think that's sort of presupposing that that's not what they signed up for in the operating agreement. I mean, if they have that position... You could argue it the other way, but don't the parties who are going to be affected by that decision need to participate in that litigation? No, Your Honor, not these tiny fractional interests like this. And Equinor has done its best not to participate. So... And there is also the Gunvor case from the Fourth Circuit. Just to be clear, your argument then is, yes, it affects their interest, but their interest is small, so they're not required to participate? No, Your Honor. My argument is the district court's decision is a reasonable exercise of its discretion when it found it's speculative that these issues are ever going to be something that these parties care about. And beyond that, that the arguments being made by Epsilon and Chesapeake sort of represent the waterfront of these issues, and there isn't any reason to think someone has a different position, particularly not one that they would care about enough to need to be a part of this. When the court finds indispensable parties, I just... When the court has found that, there's this huge missing party right there. These absent parties have not been alleged to hold any disputed interests. They're not claimed to have done anything wrong. They're not claimed to be holding anything that belongs to us. It's clear that the core of this dispute is between Chesapeake and Epsilon, and that's how we have pleaded and want to go forward in the case. Thank you, Mr. Fitzgerald. I'll give you a minute, Mr. Dempsey. Thank you. Just very briefly, Judge Hardiman, you asked, is Equinor aligned with Epsilon or are they aligned with Chesapeake? Where do they reside on the issues in the case? And I'm not sure the answer that you got. I think the answer was they've said, you go ahead, we're going to do our best to sit it out. Here's their declaration. This is the sworn affidavit. Equinor's anticipated share of the cost to drill and complete the wells proposed by Epsilon is $7.1 million. Pursuant to the terms of the operating agreement, Equinor elected not to participate. They voted against the wells. The joint operating agreements designate Chesapeake to serve as operator. The joint operating agreements include a relinquishment of interest for non-participation provision in Article 6 that, if it's applicable, includes a 200% or 400% surcharge that Epsilon may seek to impose to the Chesapeake to the detriment of Equinor. That's their position. So they want you to be the operator. Of course, the contract says if you choose not to operate, then the other folks can, but question whether one party can go it alone or whether they need other members of the agreement. And, Judge, one part of the contract I would point out, as the Court thinks about these issues, it's been set up in the argument today that the option of Chesapeake, if they disagree with the proposed wells, is to propose back new competing wells and see if they can drive up participation. Otherwise, as the argument would logically continue, Epsilon gets to unilaterally remove Chesapeake and drill the wells they wish to, which no one else agrees with. The joint operating agreements have an Article 5 that talks about Chesapeake is the operator, and there's a process to remove Chesapeake as operator. If Epsilon chooses to invoke that process and believes Chesapeake's not doing a great job... They don't have to remove you in order to drill a well. Well, if they propose a well and you say no as operator, the contract gives the other parties the opportunity to drill anyway, provided they get the sufficient support. You disagree on how much support's required. I mean, Chesapeake is not the sole operator forever under all conditions, right? You can't veto the other parties from drilling if they have sufficient support to drill. As to subsequent wells, you can't. They cannot shift operator to drill a subsequent well. The operator shifting language would permit them to do work such as plug back, rework existing wells, but not subsequent ones. And the last point I would make is, Judge Krause posed the question, and it's been raised several times, that somehow, because companies like Radler or Jamestown or some of the minor interest holders have less money at stake or less interest, are they entitled to less protection or less analysis under Rule 9? And I think the argument that you're hearing back is, yes, they are, and there is no... Thank God. There's nowhere in Rule 19 that says your property interest or your contract rights or your economic interests are not going to be evaluated as carefully if they're smaller than Equinor. There's just no support for that at all. All right. Thank you, Mr. Dempsey. Thank you, Mr. Fitzgerald.